# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| **ANNA E. BECKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV1288 LMB** |
| | ) | |
| **CAROLYN W. COLVIN,[1]** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Anna E. Becker for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 15). Defendant filed a Brief in Support of the Answer. (Doc. No. 20). Plaintiff has filed a Reply. (Doc. No. 21).

## Procedural History

On February 25, 2010, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on September 15, 2000. (Tr. 131-39). This claim

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Michael J. Astrue as the Defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

was denied initially and, following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated March 4, 2011. (Tr. 69-80, 5-16). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on June 25, 2012. (Tr. 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.  ALJ Hearing

Plaintiff's administrative hearing was held on January 27, 2011. (Tr. 20). Plaintiff was present and was represented by counsel. (Id.). Also present was vocational expert Gary Weimholt. (Id.).

Plaintiff's attorney indicated that plaintiff was waiting to receive medical records from Barnes Hospital. (Tr. 21). The ALJ stated that he would leave the record open for twenty days after the hearing. (Tr. 22).

Plaintiff's attorney examined plaintiff, who testified that she was thirty years of age. (Tr. 23). Plaintiff stated that she was five-feet, seven-inches tall, and weighed 290 pounds. (Id.).

Plaintiff testified that she had been living with a friend for about six months. (Tr. 24). Plaintiff stated that her friend works full-time during the day. (Id.).

Plaintiff testified that she has a driver's license, and that she last drove the day prior to the hearing. (Id.). Plaintiff stated that she does not own a car, and that she drives her grandmother's car between one and three times a week. (Tr. 25). Plaintiff testified that she has no trouble driving. (Id.).

Plaintiff stated that she has attended community college, and that she was two semesters away from graduating with a degree in Fine Art. (Id.). Plaintiff testified that she left college in 2010, at which time her financial aid ended because she had been attending school too long. (Id.). Plaintiff stated that her grades had started to decline. (Id.). Plaintiff testified that she had been pursing a two-year degree since 2005 because she kept dropping classes. (Tr. 26).

Plaintiff stated that she received $200.00 a month in food stamps, and she received Medicaid benefits. (Tr. 27). Plaintiff testified that she started receiving Medicaid in 2010, and that prior to that time she had no health insurance. (Id.).

Plaintiff stated that she last worked in 2008. (Id.). Plaintiff testified that she had a work-study job at the community college. (Id.). Plaintiff stated that she answered phones and "watched over" an art building at this position. (Id.). Plaintiff testified that she typically just sat down and played computer games during her four-hour shifts. (Tr. 28).

Plaintiff stated that she trained to be a CNA at Data Center Job Corp for three months in 2005. (Tr. 28-29). Plaintiff testified that she was terminated before she completed the training. (Tr. 29).

Plaintiff stated that she worked as a cashier at a gas station in 2001. (Id.).

Plaintiff testified that she also worked at the door of a bar when she was twenty-one, and that she was paid cash at this position. (Tr. 30).

Plaintiff stated that she stopped working at the community college because her work-study ended. (Id.). Plaintiff testified that she has not looked for work since then because she has always had a difficult time keeping a job. (Id.).

Plaintiff stated that it is difficult for her to work with people due to her anxiety. (Tr. 31).

Plaintiff testified that she also had problems finishing tasks because she becomes sidetracked. (Id.). Plaintiff stated that she becomes distracted after working on an activity for ten to fifteen minutes. (Tr. 32). Plaintiff testified that she is able to focus on video games for a couple hours. (Id.). Plaintiff stated that it takes her a long time to read books because she loses her concentration. (Id.).

Plaintiff testified that she experiences frequent crying spells. (Tr. 33). Plaintiff stated that she had cried four times the day of the hearing, and she cried one time the day prior to the hearing. (Id.). Plaintiff testified that sometimes she cries due to anxiety, and other times the crying is unprovoked. (Id.).

Plaintiff stated that she takes Cymbalta,[2] Lamictal,[3] Xanax,[4] and Invega[5] for her mental impairments, and she takes Topamax[6] and Imitrex[7] for her migraines. (Id.). Plaintiff stated that she experiences migraines three to five times a month. (Tr. 34). Plaintiff testified that the migraine usually stops after she takes Imitrex, although the medication is not effective about once

_____

[2]Cymbalta is indicated for the treatment of major depressive disorder and generalized anxiety disorder. See Physician's Desk Reference ("PDR"), 1801 (63rd Ed. 2009).

[3]Lamictal is indicated for the treatment of bipolar disorder. See PDR at 1490-91.

[4]Xanax is indicated for the treatment of anxiety and panic disorders. See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

[5]Invega is an antipsychotic drug indicated for the treatment of schizophrenia. See PDR at 1748.

[6]Topamax is indicated for the treatment of seizures and migraine headaches. See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

[7]Imitrex is indicated for the treatment of migraines. See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

every three months.  (Id.).

Plaintiff stated that she does not believe the Invega is effective because she continues to see "shadow people," and hear voices.  (Tr. 35).  Plaintiff stated that she also sees people and bugs that are not there.  (Id.).  Plaintiff testified that this occurs "all the time," and is distracting. (Id.).

Plaintiff stated that her medications help her anxiety and mood "somewhat."  (Id.). Plaintiff testified that she continues to experience suicidal thoughts, but the medications prevent her from acting on her thoughts.  (Id.).  Plaintiff stated that she last attempted suicide in February of 2010, at which time she was hospitalized at Barnes.  (Tr. 36).

Plaintiff stated that she has friends that she can call when she experiences suicidal thoughts.  (Id.).  Plaintiff testified that she has also been talking to a social worker at Barnes, Chris Beavin, for six months.  (Id.).  Plaintiff stated that she sees Ms. Beavin once a month, and she talks to her on the phone at least once a week.  (Id.).  Plaintiff testified that Ms. Beavin helps her by listening to her without judging her.  (Tr. 37).

Plaintiff stated that she has chronic back pain, for which she takes Percocet.[8]  (Id.). Plaintiff testified that the Percocet is effective most of the time, and it does not cause any side effects.  (Id.).  Plaintiff stated that she does not have any self-imposed limits due to her back pain. (Id.).  Plaintiff testified that she is able to lift about twenty pounds occasionally and ten pounds frequently.  (Id.).  Plaintiff stated that she would be unable to stock a shelf with gallons of milk throughout the day.  (Tr. 38).  Plaintiff testified that she is able to walk for about ten minutes

---

[8]Percocet is indicated for the relief of moderate to moderately severe pain.  See PDR at 1127.

before she has to take a break.  (Id.).

Plaintiff stated that she shops for groceries, and that she is able to walk up and down all the aisles.  (Id.).  Plaintiff testified that she leans on the grocery cart for support.  (Id.).  Plaintiff stated that she occasionally gets "spooked," by people at the grocery store.  (Tr. 39).  Plaintiff testified that she sometimes avoids going to the grocery store when she needs items.  (Id.).  Plaintiff stated that she likes to shop at night when there are less people.  (Id.).

Plaintiff testified that she does not have a schedule and wakes between 6:00 a.m. and 3:00 p.m.  (Id.).  Plaintiff stated that she usually naps during the day.  (Id.).  Plaintiff testified that she sometimes forgets to bathe.  (Id.).  Plaintiff stated that she is able to get dressed, prepare meals, and clean.  (Tr. 40).

Plaintiff testified that she enjoys painting and photography, although she does these things rarely.  (Id.).  Plaintiff stated that she does not want to "go out in the world today."  (Tr. 41).

Plaintiff testified that she gradually started wanting to stay inside her house beginning in her mid-twenties.  (Id.).  Plaintiff stated that her father died when she was nineteen, which was a significant change for her.  (Tr. 42).  Plaintiff testified that she was receiving mental health treatment in the late 1990s.  (Id.).  Plaintiff stated that she saw Dr. Carol Robinson and Dr. Deborah Schlitt at that time.  (Id.).

Plaintiff testified that she has a history of illegal drug use.  (Id.).  Plaintiff stated that she has used marijuana, cocaine, and heroin.  (Id.).  Plaintiff testified that she has also abused prescription drugs, and alcohol.  (Id.).  Plaintiff stated that she last used marijuana in July of 2010, she last used cocaine three years prior to the hearing, she last used heroin two to three years prior to the hearing, and she last consumed alcohol in December of 2010.  (Tr. 42-43).  Plaintiff

testified that she has not had an alcohol problem for more than two years. (Id.). Plaintiff stated that she participated in a substance treatment program at Barnes when she was seventeen or eighteen, and she had not been in any treatment programs since then. (Tr. 44).

The ALJ examined plaintiff, who testified that she attended class full-time at Webster University from 1998 through 2001. (Id.). Plaintiff stated that she did "fine" in school until her father died in 1999, at which time her attendance and grades dropped significantly. (Tr. 45). Plaintiff testified that she did not transfer any of her credit hours from Webster to the community college because her grade point average was so low. (Tr. 46).

Plaintiff stated that she socializes with friends, and she often serves as the designated driver for her friends. (Id.). Plaintiff testified that she attends live music shows at bars in St. Louis. (Id.). Plaintiff stated that she has a group of about ten friends. (Id.).

Plaintiff testified that she has a cell phone with texting capabilities. (Tr. 47).

Plaintiff stated that she has a library card and used to go to the library every two weeks, but she had not gone recently because she has outstanding fines. (Id.).

Plaintiff testified that she applied for a job at Wal-Mart after her work-study position ended in 2008. (Tr. 48). Plaintiff stated that she was never called for an interview. (Id.).

Plaintiff testified that she last attended college in the fall of 2010. (Tr. 49). Plaintiff stated that she stopped attending college because her financial assistance ended. (Id.).

Plaintiff testified that she abused Vicodin when she was in high school. (Id.). Plaintiff stated that she has not abused any prescription drugs since high school. (Tr. 50).

Plaintiff testified that she drives one to three times a week. (Id.). Plaintiff stated that she drives her grandmother to the grocery store and the doctor, and she occasionally drives to visit

friends.  (Id.).

Plaintiff testified that the day before the hearing was not a typical day.  (Tr. 51).  Plaintiff stated that she woke up at 6:00 a.m., took the bus to her mother's house, and played pool while she waited for a UPS package.  (Id.).  Plaintiff testified that, after the package arrived, she borrowed her grandmother's car to visit a friend's grandmother in the hospital.  (Id.).

Plaintiff's attorney re-examined plaintiff, who stated that she did not receive any special accommodations while attending classes at Webster.  (Tr. 52).  Plaintiff testified that she had difficulty attending classes on time.  (Id.).  Plaintiff stated that she also had difficulty working with other students.  (Tr. 53).  Plaintiff testified that she lived in her car while attending classes at the community college, and she did not remember whether she lived in her car while attending classes at Webster.  (Id.).

Plaintiff testified that when she attends concerts, the music helps with her anxiety.  (Id.).  Plaintiff stated that there are usually not large crowds at the concerts she attends, and she is able to sit in a quiet corner and listen to the music.  (Id.).  Plaintiff stated that she does not talk and socialize with groups of people.  (Id.).

The ALJ examined the vocational expert, Gary Weimholt, who testified that plaintiff's past work is classified as follows: kitchen helper (unskilled, medium); and cashier (unskilled, light).  (Tr. 54).  The ALJ instructed Mr. Weimholt to eliminate plaintiff's work-study receptionist position from consideration.  (Tr. 56).

The ALJ asked Mr. Weimholt to consider a hypothetical claimant with plaintiff's background and the following limitations: capable of light or sedentary work; simple, routine, and repetitive work; occasional interaction with the public; and occasional interaction with co-

workers. (Tr. 57). Mr. Weimholt testified that the individual would be unable to perform any of plaintiff's past work but would be capable of performing other light, unskilled work, such as: cleaner or housekeeper (325,000 positions nationally, 6,500 in Missouri); assembler of small products (400,000 positions nationally, 8,000 in Missouri); and inspection and hand packaging (400,000 nationally, 8,000 in Missouri). (Tr. 57-58). Mr. Weimholt stated that the individual would also be capable of performing sedentary positions, including pharmaceutical packaging (60,000 positions nationally, 1,200 in Missouri); and plastics products assembler (225,000 positions nationally, 4,500 in Missouri). (Tr. 58).

The ALJ next asked Mr. Weimholt to assume the same limitations as the first hypothetical, but the individual would also require a work environment free of fast-paced quota requirements; and simple, work-related decisions with few workplace changes. (Tr. 59). Mr. Weimholt testified that only the housekeeping position would remain. (Id.).

The ALJ then asked Mr. Weimholt to assume the limitations from the first hypothetical, with the additional limitation of little, if any, interaction with co-workers. (Tr. 60). Mr. Weimholt testified that the positions he listed in response to the first hypothetical would remain. (Tr. 61).

Mr. Weimholt testified that an individual who missed three to four days of work a month over a period of three to six months would be terminated. (Id.).

## B.    Relevant Medical Records

Plaintiff presented to Carol Robinson, M.D., on August 23, 2000, at which time she reported she was living in her car and was trying to attend classes at Webster University. (Tr. 575). Plaintiff indicated that she did not like being on antidepressants, and that she felt down, flat,

and apathetic. (Id.).

Dr. Robinson completed a Webster University Disability Verification Form, Students with Psychiatric Disabilities, on August 28, 2000. (Tr. 576-77). Dr. Robinson indicated that plaintiff had diagnoses of depression, social phobia, and history of substance abuse. (Tr. 576). Plaintiff had multiple hospitalizations in the past, and did not respond well to multiple medications. (Id.). Dr. Robinson noted that plaintiff's father had recently died. (Id.). Plaintiff had trouble concentrating and was easily distracted. (Id.). Dr. Robinson found that plaintiff required extra time for tests, and testing in a private setting. (Tr. 577). Dr. Robinson also indicated that plaintiff experienced anxiety attacks, had difficulty socializing, and experienced depressive episodes. (Id.). Dr. Robinson noted that plaintiff may have difficulty working on projects with other students. (Id.).

Plaintiff presented to the emergency room at Saint Louis University Hospital on August 31, 2000, after overdosing on prescription medications in a suicide attempt. (Tr. 536). Plaintiff was still suicidal at the time of admission and she had attempted suicide in the past. (Id.). It was noted that plaintiff was "a self-mutilator." (Id.). Plaintiff reported using substances four to five times a week. (Id.). Upon examination, plaintiff's mood was depressed, and her affect was angry. (Tr. 537). Plaintiff was diagnosed with depression NOS, rule out drug-induced depression, rule out major depression, rule out bipolar, polysubstance abuse vs. dependence, and a GAF score of 15.[9] (Id.). Plaintiff was transferred to Barnes for inpatient treatment at plaintiff's

---

[9]A GAF score of 11 to 20 denotes "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

request.  (Id.).

Plaintiff was admitted at Barnes-Jewish Hospital on August 31, 2000, at which time it was noted that plaintiff had had several hospitalizations and a long history of polysubstance abuse and depressive symptoms.  (Tr. 630).  Plaintiff had repeated suicide attempts between the ages of thirteen and seventeen.  (Id.).  Plaintiff was taking no medication at that time and was not seeing a psychiatrist.  (Tr. 631).  Upon examination, plaintiff was hostile and uncooperative.  (Tr. 632).  Suicidal ideation was present, although suicidal intent was questionable in light of the fact that plaintiff went to a friend's house immediately after taking the pills.  (Id.).  Plaintiff's mood and affect were depressed, and her judgment and insight were poor.  (Id.).  Plaintiff was discharged on September 2, 2000.  (Tr. 627).  Plaintiff's discharge diagnoses were mood disorder NOS, history of polysubstance dependence, borderline personality disorder,[10] and a GAF score of 45.[11]  (Id.). Plaintiff was prescribed Effexor[12] on discharge and was advised to follow-up with her family physician, Dr. Robinson, as she refused to see a psychiatrist.  (Tr. 628-29).

Plaintiff saw Dr. Robinson on September 11, 2000, at which time it was noted that plaintiff was staying with her aunt and was back in school.  (Tr. 578).  Plaintiff was taking

_____

[10]An enduring and pervasive pattern that begins by early adulthood and is characterized by impulsivity and unpredictability, unstable interpersonal relationships, inappropriate or uncontrolled affect, identity disturbances, rapid shifts of mood, suicidal acts, self-mutilations, job  and marital instability, chronic feelings of emptiness or boredom, and intolerance of being alone.  See Stedman's Medical Dictionary, 568 (28th Ed. 2006).

[11]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 32.

[12]Effexor is an antidepressant drug indicated for the treatment of major depressive disorder and generalized anxiety disorder.  See PDR at 3195-96.

Effexor.  (Id.).

On February 5, 2001, plaintiff reported that she was experiencing suicidal thoughts and wanted to act on them.  (Tr. 579).  Plaintiff indicated that the voices in her head were back, and that she had taken an overdose of pills from her aunt's medicine cabinet.  (Tr. 581).  Plaintiff requested a medication increase.  (Id.).  Dr. Robinson increased plaintiff's Effexor.  (Id.).

Plaintiff began seeing Deborah Schlitt, Ph.D. on March 6, 2001.  (Tr. 532).  Dr. Schlitt noted that plaintiff was taking Effexor, and reported that it was "pretty good," and was the best medication she had taken.  (Id.).

In a letter dated March 15, 2001, Dr. Robinson stated that plaintiff had taken medical leave from Webster University because of "an incapacitating flare-up of her depression."  (Tr. 583).  Dr. Robinson stated that plaintiff was now taking anti-depressant medication and hoped to return to school the following semester.  (Id.).

Plaintiff saw Dr. Schlitt on March 26, 2001, at which time plaintiff reported that she planned to start school again that fall.  (Tr. 528).  Plaintiff reported that she had done poorly in her classes due to her depression.  (Tr. 527).  Dr. Schlitt indicated that plaintiff would be tested for ADHD.[13]  (Id.).  In April 2001, Dr. Schlitt diagnosed plaintiff with ADHD and major depressive disorder.  (Tr. 524).

On May 1, 2001, plaintiff reported that she had lost her job due to a "personality conflict," and that she was "feeling bummed."  (Tr. 584).  Plaintiff was seeing Dr. Schlitt, who had

_____

[13]A behavioral disorder manifested by developmentally inappropriate degrees of inattentiveness (short attention span, distractability, inability to complete tasks, difficulty in following directions), impulsiveness (acting without due reflection), and hyperactivity (restlessness, fidgeting, squirming, excessive loquacity).  Stedman's at 568.

diagnosed her with ADHD.  (Id.).  Dr. Robinson prescribed Adderall.[14]  (Id.).  Plaintiff continued

to see Dr. Robinson for medication refills, and for minor physical complaints.  (Tr. 586-95).

Plaintiff was admitted at Forest Park Hospital on October 9, 2006, after reporting suicidal

ideation.  (Tr. 229).  Plaintiff reported suicidal thoughts with a fleeting plan to take an overdose.

(Id.).  Plaintiff benefitted from the safe, structured environment; therapy; and medication.  (Id.).

Plaintiff was discharged on October 11, 2006, with diagnoses of major depressive disorder

recurrent, without psychosis; rule out bipolar disorder type 2;[15] and a GAF score of 35.[16]  (Tr.

230).  Plaintiff was prescribed Effexor.  (Id.).

Plaintiff underwent an L5-S1 hemilaminectomy[17] microdiscectomy[18] on January 17, 2007,

due to complaints of back and left lower leg pain resulting from a herniated disc at L5-S1.  (Tr.

693).

Plaintiff received treatment for nose trauma at St. Alexius Hospital on March 6, 2007,

after she reported she disarmed a woman who attacked her with a knife.  (Tr. 546).

Plaintiff started seeing Dr. Schlitt on April 2, 2007, after last being seen in 2001.  (Tr.

---

[14]Adderall is indicated for the treatment of ADHD.  See PDR at 3013.

[15]An affective disorder characterized by the occurrence of alternating, hypomanic and
major depressive episodes.  Stedman's at 568.

[16]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or
communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in
several areas, such as work or school, family relations, judgment, thinking, or mood (e.g.,
depressed man avoids friends, neglects family, and is unable to work...)."  DSM-IV at 32.

[17]Removal of a portion of a vertebral lamina, usually performed for exploration of, access
to, or decompression of the intraspinal contents.  Stedman's at 866.

[18]Excision of an intervertebral disc.  Stedman's at 550.

523).  Plaintiff reported that she had gotten into a fight while she was out drinking.  (Tr. 521).

Plaintiff reported hearing voices that were hard to tune out.  (Tr. 520).  Plaintiff also reported

seeing shadows, which were not there on second glance.  (Tr. 519).

Plaintiff was admitted at Hyland Behavioral Health Center from April 16, 2008, through

April 18, 2008, after reporting experiencing visual hallucinations, auditory hallucinations telling

her to hurt herself, suicidal thoughts, and reported poking her left arm with a diabetic syringe

several times as a suicide attempt.  (Tr. 254).  Plaintiff was attending Forest Park College, and

denied any substance use.  (Id.).  Upon examination, plaintiff was nervous, crying, suicidal,

experienced hallucinations, and her insight and judgment were impaired.  (Id.).  Upon discharge,

plaintiff was diagnosed with depression with psychotic features; and panic and anxiety.  (Tr. 253).

Plaintiff was prescribed Effexor, Xanax, and Risperdal.[19]  (Id.).

On June 20, 2008, plaintiff presented to the emergency room at Metropolitan St. Louis

Psychiatric Center.  (Tr. 315).  Plaintiff had been poking herself with needles.  (Id.).  Plaintiff was

diagnosed with mood disorder NOS, and borderline personality disorder, with a GAF score of 50.

(Tr. 318).  Plaintiff was prescribed Effexor.  (Tr. 319).

Plaintiff presented to Grace Hill Neighborhood Health Centers ("Grace Hill") on June 24,

2008.  (Tr. 278).  It was noted that plaintiff inserts hypodermic needles into her arms when she is

upset and also has a history of cutting.  (Id.).  Plaintiff was tearful and reported being depressed

for seven days.  (Id.).  Plaintiff reported rapid cycles of manic and depressive episodes and had a

diagnosis of bipolar disorder.  (Id.).

---

[19]Risperdal is a psychotropic drug indicated for the treatment of schizophrenia.  See PDR
at 1754.

Plaintiff saw Mina Charepoo, M.D., at Grace Hill on July 10, 2008, at which time it was noted that plaintiff's borderline personality is most likely responsible for her impulsive symptoms and poor coping skills. (Tr. 277). Plaintiff was in school and was working as a secretary in the art department through a work-study program. (Id.). Dr. Charepoo continued plaintiff's Effexor and Xanax, and started her on Ritalin.[20] (Id.). Plaintiff saw Dr. Charepoo on August 14, 2008, at which time it was noted plaintiff was doing better now that she was seeing a therapist. (Tr. 273). Plaintiff was taking her medications regularly, was enrolled in school, and was working. (Id.). Plaintiff's dosage of Ritalin was increased. (Id.). On September 11, 2008, Dr. Charepoo noted that plaintiff was doing well with therapy and medications. (Tr. 270). On October 21, 2008, plaintiff reported symptoms of obsessive compulsive disorder ("OCD")[21] to her therapist. (Tr. 267). Plaintiff was tearful and was experiencing suicidal ideation. (Id.).

Plaintiff saw Drew Sylvester, M.D. at Grace Hill on December 10, 2008, at which time plaintiff reported that she stopped taking her Effexor because it was no longer effective. (Tr. 266). Plaintiff reported a heroin binge a few weeks prior. (Id.). Plaintiff requested Ritalin and Xanax. (Id.). Plaintiff indicated that she was having difficulty sleeping, feeling irritable and depressed. (Id.). Plaintiff continued to attend school and was working. (Id.). Upon examination, plaintiff's affect was full at times and irritable at other times; and plaintiff reported

---

[20]Ritalin is indicated for the treatment of ADHD. See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

[21]A type of anxiety disorder the essential features of which include recurrent obsessions, persistent intrusive ideas, thoughts, impulses or images, or compulsions sufficiently severe to cause marked distress, be time-consuming, or significantly interfere with the person's normal routine, occupational functioning, usual social activities, or relationships with others. See Stedman's at 570.

seeing "shadow people." (Id.). Dr. Sylvester diagnosed plaintiff with substance abuse, rule out

ADHD, rule out major depressive disorder, borderline personality disorder, antisocial personality

disorder,[22] histrionic personality disorder,[23] and a GAF score of 50. (Tr. 265). Dr. Sylvester

recommended starting Klonopin[24] and Zyprexa.[25] (Id.). Dr. Sylvester also recommended that

plaintiff see a psychiatrist and case manager at BJC. (Tr. 264).

Plaintiff saw Dr. Robinson on December 22, 2008, at which time plaintiff reported that she

was looking for a new psychiatrist. (Tr. 604). Dr. Robinson diagnosed plaintiff with bipolar

disease and prescribed Xanax and Ritalin. (Id.).

On February 27, 2009, state agency psychologist Kyle DeVore, Ph.D. completed a

Psychiatric Review Technique, in which he expressed the opinion that plaintiff had mild limitations

in her activities of daily living; moderate limitations in her ability to maintain social functioning

and ability to maintain concentration, persistence, or pace; and one or two episodes of

decompensation. (Tr. 390). Dr. DeVore also completed a Mental Residual Functional Capacity

Assessment, in which he found that plaintiff had moderate limitations in the following areas:

ability to understand and remember detailed instructions; ability to carry out detailed instructions;

---

[22]An enduring and pervasive pattern characterized by continuous and chronic antisocial behavior with disregard for and violation of the rights and safety of others, beginning before the age of 15. Stedman's at 567.

[23]An enduring and pervasive pattern of behavior in adulthood characterized by excessive, dramatic, and shallow emotionality; attention-seeking; and demands for approval and reassurance, beginning in early childhood and present in a variety of contexts. Stedman's at 569.

[24]Klonopin is indicated for the treatment of panic disorder. See PDR at 2639.

[25]Zyprexa is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder, and agitation associated with schizophrenia and bipolar I mania. See PDR at 1884-85.

ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; ability to interact appropriately with the general public; ability to accept instructions and respond appropriately to criticism from supervisors; ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and the ability to respond appropriately to changes in the work setting. (Tr. 393-94). Dr. DeVore stated that, with continued abstinence from all illegal drugs and alcohol and compliance with treatment, plaintiff remains capable of two-three step directions, and work that does not require detailed attention or repetitive simple computations. (Tr. 395).

Plaintiff presented to Sherifa Iqbal, M.D., at BJC Behavioral Health on May 26, 2009, for a psychiatric assessment. (Tr. 463-71). Plaintiff had been off all medications since March 2009. (Tr. 463). Plaintiff reported symptoms of being edgy, decreased mood, decreased energy, a feeling that she had ants crawling all over her for one day, and panic. (Id.). Plaintiff indicated that she took up to four times the amount of Xanax prescribed to her. (Id.). Plaintiff reported that she had been isolative and had not been out of the house in the past week, but plaintiff later reported that she had gone out within the week to a club to watch a band perform. (Tr. 464). Plaintiff reported that she still smokes marijuana because it is the only thing that helps her migraines. (Id.). Plaintiff indicated that she had been fired from her work-study position. (Tr. 466). Plaintiff planned to register for classes for the fall semester. (Tr. 467). Plaintiff had a history of sexual abuse by her father's friend, and physical and mental abuse by her alcoholic

father.  (Id.).  Plaintiff reported hobbies of reading, going out, video games, puzzles, computer use, and participating in a scooter club.  (Id.).  Plaintiff was on probation for an assault charge.  (Tr. 468).  Upon mental status examination, plaintiff was initially pleasant but became angry, irritable, and tearful when Dr. Iqbal would not give her Xanax; her affect was full, appropriately tearful at times and otherwise euthymic; her insight and judgment were fair.  (Id.).  Dr. Iqbal diagnosed plaintiff as follows: multiple alcohol and substance abuse diagnoses, rule out ADHD, rule out substance induced mood disorder versus major depressive disorder, borderline personality disorder, rule out antisocial personality disorder, histrionic personality disorder by history, and a GAF score of 50.  (Tr. 469-70).  Plaintiff refused treatment when she was told she would not be prescribed Xanax, and indicated that she would get Xanax illegally.  (Tr. 470).  Dr. Iqbal indicated that he would discuss plaintiff's case with the treatment team and proper referrals would be determined.  (Tr. 471).

Plaintiff presented to Vani Pachalla, M.D. at Grace Hill on January 21, 2010, with complaints of anxiety and depression.  (Tr. 438).  Plaintiff reported anxious, fearful thoughts; depressed mood; hallucinations; hearing voices; panic attacks; poor concentration; indecisiveness; and thoughts of death or suicide.  (Id.).  Plaintiff indicated that it was somewhat difficult to meet home, work, or social obligations.  (Id.).  Upon psychiatric examination, Dr. Pachalla noted that plaintiff was anxious, felt hopeless, had mood swings, had obsessive thoughts, was paranoid, and did not have suicidal ideation.  (Tr. 439).  Dr. Pachalla diagnosed plaintiff with depression; and anxiety state, unspecified.  (Id.).  Dr. Pachalla prescribed Xanax and Prozac.[26]  (Id.).

---

[26]Prozac is a psychotropic drug indicated for the treatment of major depressive disorder.  See PDR at 1852-1854.

- 18 -

Plaintiff was admitted at Barnes-Jewish Hospital from February 20, 2010, through February 22, 2010, after trying to overdose on February 19, 2010. (Tr. 431). Plaintiff was found by her mother with multiple empty bottles of prescription medication. (Id.). During her hospitalization, plaintiff complained of hearing voices and seeing images, and indicated that the voices told her to kill herself the night of her suicide attempt. (Tr. 432). Upon discharge, plaintiff was prescribed Prozac and Xanax. (Id.).

Plaintiff saw Dr. Pachalla on March 22, 2010, at which time plaintiff reported symptoms of diminished interest or pleasure, manic episodes, and restlessness or sluggishness. (Tr. 442). Plaintiff was not doing well in school. (Id.). Upon examination, plaintiff was anxious, had flight of ideas, had mood swings, and did not have suicidal ideation. (Tr. 443). Dr. Pachalla diagnosed plaintiff with depression and ADHD. (Id.). Dr. Pachalla prescribed Xanax, Adderall, and Cymbalta. (Id.).

Dr. Pachalla completed a Mental Medical Source Statement on April 21, 2010, in which she expressed the opinion that plaintiff had marked limitations in her ability to function independently, behave in an emotionally stable manner, make simple and rational decisions, maintain attention and concentration for extended periods, and perform at a consistent pace without an unreasonable number and length of breaks; and moderate limitations in her ability to cope with normal stress, maintain reliability, adhere to basic standards of neatness and cleanliness, relate to family and peers, interact with strangers or the general public, accept instructions or respond to criticism, ask simple questions or request assistance, maintain socially acceptable behavior, sustain an ordinary routine without special supervision, and respond to changes in a work setting. (Tr. 475-76). Dr. Pachalla found that plaintiff could apply commonsense

understanding to carry out simple one-or-two-step instructions for four hours in a day; interact appropriately with coworkers for zero to two hours a day; interact appropriately with supervisors for four hours a day; and interact appropriately with the general public for four hours a day. (Tr. 477). With regard to absenteeism, Dr. Pachalla indicated that plaintiff had missed school since February due to depression and a recent hospital admission. (Id.). Dr. Pachalla listed plaintiff's diagnoses as depression and ADHD. (Tr. 478).

On April 22, 2010, plaintiff complained of worsening depression, with symptoms of anxious, fearful thoughts; depressed mood; feelings of guilt or worthlessness; panic attacks; poor concentration and indecisiveness. (Tr. 560). Plaintiff also reported experiencing a panic attack the previous day. (Id.). Dr. Pachalla noted that plaintiff was seeing a psychiatrist at BJC. (Id.). Dr. Pachalla diagnosed plaintiff with depression; and anxiety state, unspecified. (Tr. 561). Dr. Pachalla continued the Cymbalta, and increased the Xanax. (Id.).

On May 20, 2010, state agency psychologist Marsha Toll, Psy.D., completed a Psychiatric Review Technique, in which she expressed the opinion that plaintiff had a mild limitation in her activities of daily living; moderate limitations in her ability to maintain social functioning, and ability to maintain concentration, persistence, or pace; and no episodes of decompensation. (Tr. 487). Dr. Toll also completed a Mental Residual Functional Capacity Assessment, in which she found plaintiff had moderate limitations in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; interact appropriately with the general public; accept instructions and respond

appropriately to criticism from supervisors; and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (Tr. 491-92). Dr. Toll stated that, if plaintiff is abstinent from all poly-substance use, she should be capable of at least 1-2 step directions and instructions. (Tr. 493). Dr. Toll stated that plaintiff should avoid work situations that would require constant attention, such as assembly line work or work that would require routine paper work. (Id.).

On June 24, 2010, plaintiff reported experiencing anxious, fearful thoughts; depressed mood; poor concentration; indecisiveness; and sleep disturbance. (Tr. 563). Dr. Pachalla continued plaintiff's medications. (Tr. 564).

Plaintiff presented to Surenda Chaganti, M.D., on October 6, 2010, for a psychiatric examination upon the referral of her BJC case worker, Chris Beavin. (Tr. 703-04). Dr. Chaganti diagnosed plaintiff with schizoaffective disorder,[27] mixed vs. bipolar affective disorder with psychosis; and assessed a GAF score of 45-50. (Tr. 704). Dr. Chaganti prescribed Lamictal, Fanapt,[28] Xanax, and Cogentin.[29] (Tr. 705). On November 3, 2010, Dr. Chaganti added Topamax and Invega. (Tr. 706). Dr. Chaganti adjusted the dosages of plaintiff's medications on November 17, 2010, and December 15, 2010. (Tr. 707-08).

---

[27]An illness manifested by an enduring major depressive, manic, or mixed episode along with delusions, hallucinations, disorganized speech and behavior, and negative symptoms of schizophrenia. In the absence of a major depressive, manic, or mixed episode, there must be delusions or hallucinations for several weeks. Stedman's at 570.

[28]Fanapt is indicated for the treatment of schizophrenia. See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

[29]Cogentin is used to treat involuntary movements due to the side effects of certain antipsychotic drugs. See WebMD, http://www.webmd.com/drugs (last visited September 16, 2013).

Chris Beavin, MSW, LCSW, plaintiff's case worker, completed a Mental Medical Source Statement on December 2, 2010. (Tr. 494-97). Ms. Beavin expressed the opinion that plaintiff had extreme limitations in her ability to behave in an emotionally stable manner, relate to family or peers, interact with strangers or the general public, maintain socially acceptable behavior, and perform at a consistent pace without an unreasonable number and length of breaks. (Tr. 494-95). Plaintiff had marked limitations in her ability to cope with normal stress, adhere to basic standards of neatness and cleanliness, accept instructions or respond to criticism, maintain attention and concentration for extended periods, and sustain an ordinary routine without special supervision. (Id.). Ms. Beavin found that plaintiff had moderate limitations in her ability to function independently, maintain reliability, ask simple questions or request assistance, make simple and rational decisions, and respond to changes in a work setting. (Id.). Ms. Beavin expressed the opinion that plaintiff was able to perform the following tasks for zero to two hours total in a day: carry out simple one-or-two-step instructions, interact appropriately with co-workers, interact appropriately with supervisors, and interact appropriately with the general public. (Tr. 496). Ms. Beavin found that plaintiff would miss work due to psychological symptoms twice a month. (Id.).

**Evidence Submitted to the Appeals Council**

Plaintiff was admitted at Hyland Behavioral Health Center from March 20, 2011, through March 24, 2011. (Tr. 726-52). Plaintiff reported increased depression with suicidal thoughts and hallucinations. (Tr. 731, 734).

Plaintiff saw Dr. Chaganti from February 2011 through August 2011. (Tr. 710-22). Dr. Chaganti continued to adjust plaintiff's medications. (Id.).

# The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act.

2.    The claimant has not engaged in substantial gainful activity since September 15, 2000, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: bipolar, anxiety, personality disorder, attention deficit hyperactivity disorder (ADHD), low back spondylosis, and obesity(20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to jobs that involve simple, routine, and repetitive tasks requiring occasional interaction with the public and occasional interaction with co-workers.

6.    The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on April 4, 1980 and was 20 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from September 15, 2000, through the date of this decision (20 CFR 404.1520(g)

and 416.920(g)).

(Tr. 10-16).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits protectively filed on February 25, 2010, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

> Based on the application for supplemental security income protectively filed on February 25, 2010, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 16).

## Discussion

### A.  Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)(citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing

test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.**     **Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I)(1)(a); U.S.C. § 423 (d)(1)(a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in

Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  <u>See</u> 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  <u>See</u> 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  <u>See id.</u>  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. <u>See</u> 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  <u>See id.</u>  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  <u>See</u> <u>Beckley v. Apfel</u>, 152 F.3d 1056, 1059 (8th Cir. 1998).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a.  The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1).  If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2).  The Commissioner must then rate the degree

of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace.  <u>See</u> 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3).  Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities.  <u>See</u> <u>id.</u>  Next, the Commissioner must determine the severity of the impairment based on those ratings.  <u>See</u> 20 C.F.R. §§ 404.1520a (c), 416.920a (c).  If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder.  <u>See</u> 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2).  This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders.  <u>See</u> <u>id.</u>  If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment.  <u>See</u> 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

**C.**     <u>**Plaintiff's Claims**</u>

Plaintiff argues that the ALJ erred in evaluating plaintiff's mental impairments when determining plaintiff's RFC.  Specifically, plaintiff contends that the ALJ erred in the following respects:  the ALJ failed to consider plaintiff's condition of chronic mental illness, which involves variations in functioning longitudinally; the ALJ rejected the opinions of plaintiff's treating physician, Dr. Pachalla; the ALJ failed to properly evaluate the opinions of the non-examining state agency psychologists; the ALJ's RFC determination does not include all of the limitations provided by plaintiff's severe impairments; and the ALJ did not include a narrative discussion of the RFC assessment.

The ALJ made the following determination with regard to plaintiff's RFC:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to jobs that involve simple, routine, and repetitive tasks requiring occasional interaction with the public and occasional interaction with co-workers.

(Tr. 12).

RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and claimant's description of her limitations. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001). Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (citing Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. See Lauer, 245 F.3d at 704 (some medical evidence must support the determination of the claimant's RFC); Casey v. Astrue, 503 F.3d 687, 697 (8th Cir. 2007) (the RFC is ultimately a medical question that must find at least some support in the medical evidence in the record). An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

As previously noted, plaintiff contends that the ALJ erred in rejecting the opinions of treating physician Dr. Pachalla. Dr. Pachalla completed a Mental Medical Source Statement on April 21, 2010, in which she expressed the opinion that plaintiff had either marked or moderate limitations in every area assessed. (Tr. 475-76). Dr. Pachalla also found that plaintiff could carry out simple one-or-two-step instructions a total of four hours a day, interact appropriately with co-workers a total of zero to two hours a day, interact appropriately with supervisors four hours a

day, and interact appropriately with the general public four hours a day. (Tr. 477). Dr. Pachalla noted that plaintiff had missed school since February of 2010 due to depression. (Id.).

The ALJ indicated that he was not assigning significant weight to Dr. Pachalla's opinions for the following reasons: Dr. Pachalla may be sympathetic to plaintiff; her conclusions are not linked to medical evidence; and her conclusions are not supported by her own observations or plaintiff's ability to function as evidenced by her typical daily activities. (Tr. 14).

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight . . . provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). See also SSR 96-2P, 1996 WL 374188 (July 2, 1996) ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). However, "[w]hen a treating physician's opinions are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 929-30 (8th Cir. 2010) (internal quotation marks omitted).

"'When an ALJ discounts a treating physician's opinion, he should give good reasons for doing so.'" Martise v. Astrue, 641 F.3d 909, 925 (8th Cir. 2011) (quoting Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007)). When an opinion is not given controlling weight as the opinion of a treating source, the weight given to the opinion depends on a number of factors, including whether the source has examined the claimant, the nature and extent of the treatment relationship, the relevant evidence provided in support of the opinion, the consistency of the

opinion with the record as a whole, whether the opinion is related to the source's area of specialty, and other factors. 20 C.F.R. §§ 404.1527(c).

The undersigned finds that the ALJ erred in rejecting the opinion of Dr. Pachalla. The opinion of Dr. Pachalla, as plaintiff's physician, is entitled to substantial weight provided it is not inconsistent with the record. The ALJ indicated that Dr. Pachalla's findings were not linked to medical evidence, and were not supported by her own observations. While Dr. Pachalla did not provide detailed findings in her source statement, her findings are supported by her treatment notes. In January 2010, Dr. Pachalla noted that plaintiff was anxious, felt hopeless, experienced mood swings and obsessive thoughts, and was paranoid. (Tr. 439). Dr. Pachalla diagnosed plaintiff with depression; and anxiety state, and prescribed Xanax and Prozac. (Id.). In March 2010, Dr. Pachalla found plaintiff was anxious, had flight of ideas, and mood swings. (Tr. 443). Plaintiff reported that she was not doing well in school. (Tr. 442). Dr. Pachalla diagnosed plaintiff with depression and ADHD. (Id.). She prescribed Xanax, Adderall, and Cymbalta. (Id.). On April 22, 2010, the day after Dr. Pachalla completed her medical source statement, plaintiff complained of worsening depression. (Tr. 560). Dr. Pachalla increased plaintiff's dosage of Xanax. (Tr. 561). Dr. Pachalla's treatment notes reveal that plaintiff experienced significant symptoms as a result of her mental impairments, and that Dr. Pachalla treated plaintiff with multiple psychotropic medications.

The remainder of the medical evidence is also supportive of Dr. Pachalla's findings. Plaintiff had multiple psychiatric hospitalizations due to suicidal thoughts and suicide attempts. In fact, plaintiff was hospitalized at Barnes from February 20, 2010, through February 22, 2010, after trying to overdose by taking prescription medications. (Tr. 431). During her

hospitalization, plaintiff complained of hearing voices and seeing images, and indicated that the voices had told her to kill herself the night of her suicide attempt. (Tr. 432). Plaintiff was under Dr. Pachalla's care at this time, and Dr. Pachalla authored her Mental Medical Source Statement only two months later. In addition, plaintiff's case worker, Ms. Beavin, completed a Mental Medical Source Statement in December 2010, in which she found plaintiff had extreme, marked, or moderate limitations in every area assessed. (Tr. 494-97). Thus, contrary to the ALJ's finding, the medical evidence of record is consistent with Dr. Pachalla's findings.

The ALJ also indicated that Dr. Pachalla's opinions were inconsistent with plaintiff's daily activities. (Tr. 14). The ALJ pointed out that plaintiff has attended school full-time for periods of time, goes out to listen to music on occasion, and has friends. (Tr. 13). "Although the mere existence of symptom-free periods may negate a finding a disability when a physical impairment is alleged, symptom-free intervals do not necessarily compel such a finding when a mental disorder is the basis of a claim." Andler v. Chater, 100 F.3d 1389, 1393 (8th Cir. 1996). "Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." Id.

Here, the ALJ ignored medical evidence that plaintiff's mental impairments varied in severity over time. Dr. Pachalla and plaintiff's other treating providers regularly adjusted plaintiff's medication regimen based on her symptoms. Despite plaintiff's psychiatric treatment and medication management, she was hospitalized on numerous occasions due to exacerbation of symptoms. The ALJ erred in rejecting Dr. Pachalla's opinion that was supported by her own treatment notes and the other medical evidence.

Plaintiff argues that the ALJ erred in assigning significant weight to the opinions of two non-examining state agency psychologists. Plaintiff also contends that the ALJ failed to provide a narrative discussion of the rationale for his RFC findings, and that the RFC determination is not supported by the medical evidence. The undersigned agrees.

In determining plaintiff's RFC, the ALJ discussed the opinions of state agency psychologists Drs. DeVore and Toll. Dr. DeVore completed a Psychiatric Review Technique in February 2009, in which he expressed the opinion that plaintiff had mild and moderate limitations. (Tr. 390). Dr. Toll completed a Psychiatric Review Technique in May 2010, in which she also found that plaintiff had mild to moderate limitations. (Tr. 487). Drs. Devore and Toll both found that plaintiff was capable of at least one-two-step directions and instructions if she was abstinent from all poly-substance use. (Tr. 395, 493). The ALJ stated that these opinions were consistent with each other and with the evidence of record. (Tr. 13-14).

"[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (internal quotation marks and citation omitted). The ALJ erred in relying on the opinions of the state agency psychologists. The ALJ does not indicate how the medical record supports these findings. In fact, the ALJ discussed very few of the treatment notes from plaintiff's treating physicians and psychiatrists, or from plaintiff's hospitalizations. The medical evidence of record reveals that plaintiff experienced significant psychiatric symptomatology, including suicidal thoughts, suicide attempts, and psychotic symptoms. The only examining physician who expressed an opinion regarding plaintiff's functional limitations found much greater limitations than those found by the non-examining state agency psychologists.

Because the ALJ improperly disregarded the opinion of plaintiff's treating physician and the other medical evidence of plaintiff's impairments, substantial evidence as a whole does not support the ALJ's decision and the matter must be remanded.

## Conclusion

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence. The ALJ failed to assign the proper weight to the opinion of treating physician Dr. Pachalla, and relied instead on the opinions of non-examining state agency psychologists. The ALJ's assessment of plaintiff's mental residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity. For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly evaluate the opinion of Dr. Pachalla; formulate a new mental residual functional capacity for plaintiff based on the medical evidence in the record; and then continue with the next steps of the sequential evaluation process. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this __16th__ day of September, 2013.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE